**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JANE DOE, INDIVIDUALLY AND, | : | |
| ON BEHALF OF HER MINOR | : | |
| CHILDREN, AND JOHN DOE 1, | : | |
|     PLAINTIFFS, | : | |
| | : | CIVIL ACTION NO. 3:06cv1262 (VLB) |
| | : | |
| v. | : | |
| | : | FEBRUARY 13, 2013 |
| PETER WARAKSA, MARY BUCKLEY | : | |
| AND THE TOWN OF EAST WINDSOR, | : | |
|     DEFENDANTS. | : | |

## MEMORANDUM OF DECISION GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [Dkt. ## 241 and 242]

Before the Court are the Defendant Town of East Windsor (the "Town") and Defendant Mary Buckley's ("Buckley") motions for summary judgment. [Dkt.## 241 and 242 respectively]. The Plaintiffs Jane Doe and her three children John Doe 1, John Doe 2, John Doe 3 have brought a 42 U.S.C. §1983 claim for violation of due process against Defendants Peter Waraksa ("Waraksa"), Buckley and the Town in connection with Waraksa's sexual abuse of John Doe 1, John Doe 2 and John Doe 3. The Plaintiffs have also brought state law claims for sexual assault and battery of a minor, negligent infliction of emotional distress, intentional infliction of emotional distress, false imprisonment, negligent retention and supervision of employee, and negligence per se. For the foregoing reasons, the Court grants Defendants' motions for summary judgment on Plaintiffs' 42 U.S.C. §1983 claim on the basis that Waraksa did not act under color of state law and declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.

Facts

The following relevant facts are undisputed unless otherwise noted. The Town of East Windsor's Emergency Management Agency (the "Agency") is responsible for the coordination of communications between the various emergency response departments of the Town in the event of a disaster or emergency. [Dkt. #241, Town's Local Rule 56(a)(1) Statement, ¶1]. The Agency is overseen by a director who reports to the Town's First Selectman. *Id.* at ¶2. Mary Buckley was appointed Director of the Agency in 1992. *Id.* at ¶5. Buckley was a neighbor of Peter Waraksa. [Dkt. #242, Buckley's Local Rule 56(a)(1) Statement, ¶5]. As a neighbor, Buckley arranged to have Waraksa feed her cats when she went away and he would cut her grass and plow her driveway from time to time for which she paid him. *Id.* at ¶6. Buckley was a State Trooper for the State of Connecticut from approximately June 1980 until September 2007. *Id.* at ¶2.

Jane Doe met Sherry Waraksa, the wife of Peter Waraksa, in May of 2001. [Dkt. #241, Town's Local Rule 56(a)(1) Statement, ¶11]. Jane Doe met Peter Waraksa in June 2001. *Id.* at ¶12. Jane Doe, Sherry and Peter Waraksa became good friends. *Id.* at ¶13. Beginning in June 2001 through 2004, Jane Doe and her three children John Does 1, 2 and 3 would visit the Waraksa home. *Id.* at ¶14. Jane Doe trusted Peter Waraksa and named him as an emergency contact for John Doe 1 at his school. [Dkt. #241, Town's Local Rule 56(a)(1) Statement, t ¶6; *see also* [Dkt. #170, Ex. H, p. 24-25]. Jane Doe testified that she and her children would periodically go over to the Waraksa house to go swimming in their pool

2

and to barbecue.  [Dkt. #170, Ex. H, p. 27].  John Does 1, 2 and 3 stayed overnight to play with other children who were also staying with the Waraksas.  [Dkt. #220, Attach 5, Jane Doe Dep., p.35]; [Dkt. #241, Town's Local Rule 56(a)(1) Statement, ¶24].  Waraksa brought John Doe 1 to Town events and parades.  [Dkt. 242, Buckley Local Rule 56(a)1 Statement ¶31].  Jane Doe had no reservations or concerns about bringing her children to the Waraksa residence from June 2001 through 2004.  [Dkt. #242, Buckley's Local Rule 56(a)(1) Statement, ¶15]. Beginning in 2003 or 2004, Jane Doe began having Sherry and Peter Waraksa watch John Does 1, 2 and 3.  *Id.* at ¶20.  The Waraksas babysat for the boys overnight on Friday while Jane Doe was working.  [Dkt. #2220, Attach. 5, Jane Doe Dep., p.30].

Throughout his involvement with the children, beginning in June of 2001 and continuing through 2004, Peter Waraksa made comments and did things suggestive of sexual misconduct with the Plaintiffs. He often made comments to Jane Doe about pulling down the Plaintiffs' pants and paddling their naked bottoms. *Id.* at ¶17. He suggested that the boys swim naked and he frequently touched the minor plaintiffs. *Id.*  In response, Jane Doe would ask Peter Waraksa to stop and keep his hands off her children.  *Id.* at ¶18.  On a few occasions, Peter Waraksa also told Jane Doe that he examined and observed bruises, marks and rashes on John Doe 1's private areas.  *Id.* at ¶19.

In 2003, nearly two years after befriending Jane Doe and her sons, Peter Waraksa became a member of a volunteer organization known as the Emergency Management Agency. *Id.* at ¶9.  Peter Waraksa testified that Buckley asked him to

create a youth cadet program for the Agency.  [Dkt. #248, Pl. Local Rule 56(a)2 Statement,¶12].  However, Buckley testified that at no time did she organize or request that a formal youth cadet program be organized.  [Dkt. #242, Buckley Local Rule 56(a)1 Statement, ¶12]. In the spring of 2004, Peter Waraksa approached Jane Doe about John Doe 1 becoming involved in the Emergency Management Agency.  *Id.* at ¶32.  Jane Doe agreed and John Doe 1 became a cadet.  Prior to John Doe 1's involvement, there was only one other minor allowed to participate in Agency events.  *Id.* at ¶11.  The other minor was the son of another member's girlfriend. *Id.*  It appears that only John Doe 1 and the other member's girlfriend's son were participants in the "cadet program."[1]   Peter Waraksa brought John Doe 1 to Town events and parades prior to John Doe's involvement in the cadet program. *Id.* at ¶31.   John Does 2 and 3 were not involved with the Emergency Management Agency.  *Id.* at ¶35.

Jane Doe testified that John Doe 1 would stay overnight at the Waraksas whenever there was an Agency event.  [Dkt. #220, Attach 5, Jane Doe Dep., p.29]. Jane Doe stated that "staying overnight at the Waraksa residence before some of these [Emergency Management Agency] events" was "something that was arranged because it was convenient."  *Id.* at p.70.  John Doe 1 testified that he would stay overnight before Agency events "because it would be easier.  I don't know who asked who to stay over, but I'd stay there, get dressed in the morning.

---

[1] **The Plaintiffs assert that the Waraksa hosted "cadet sleepovers" the night before Agency events.  However there is no evidence in the record to substantiate this fact beyond Plaintiffs' conclusory statement.  There is no evidence that the other cadet had also slept over on the nights when Waraksa allegedly sexually assaulted John Does 1, 2 or 3.**

He'd have me mow his lawn a lot before, and then I'd get dressed there, and then we'd go to the function."  [Dkt. #241, Ex. K, John Doe 1 Dep., p. 33].  In addition, Waraksa testified that John Does 2 and 3 also slept over night at his house on nights before events in which the Agency participated, but that "[m]ost of the time it would be John Doe No. 1 because he was the only member of the family that was part of Emergency Management."  [Dkt. #197, Ex. 29, Waraksa Dep., p. 80].

Jane Doe admits that John Doe 1 did not stay at the Warakas home solely for Agency events.  She testified that he stayed overnight at the Waraksa residence, not only for the convenience of participating in agency events, but also for other reasons.  She testified that the Waraksa's babysat for her and that her children slept at their house because of her work schedule.   [Dkt. #220, Attach 5, Jane Doe Dep., p.30].   In 2004 and 2005, John Doe 1 slept at the Waraksas the night before they took him on trips to museums and amusement parks.  *Id.* at 31; *see also* [Dkt. #241, Town's Local Rule 56(a)(1) Statement, ¶23]. As mentioned above, John Does 1, 2 and 3 stayed overnight to play with other children who were also staying with the Waraksas and while their mother worked on Friday nights.  [Dkt. #220, Attach 5, Jane Doe Dep., p.35]; [Dkt. #241, Town's Local Rule 56(a)(1) Statement, ¶24 and 25].  From May through August 2005 Jane Doe worked a Friday night shift at a bowling alley and arranged for the Waraksa's to babysit John Does 1, 2 and 3 overnight at the Waraksa's residence while she was working.  [Dkt. #241, Town's Local Rule 56(a)(1) Statement, ¶¶25-26].

In 2005, Peter Waraksa ascended to the volunteer position of deputy assistant director of the Emergency Management Agency.  [Dkt. #242, Buckley's Local Rule 56(a)(1) Statement, ¶4].   Plaintiffs assert that Peter Waraksa perpetrated the first instance of sexual assault/ misconduct upon John Doe 1 during the weekend proceeding Memorial Day in May 2005.  *Id.* at ¶38.  The first instance of sexual assault /misconduct upon John Does 2 and 3 also occurred in May 2005.  [Dkt. #241, Town's Local Rule 56(a)(1) Statement, ¶42].  None of the sexual assaults or misconduct occurred during any Town or Emergency Management event.  *Id.* at ¶47.  Jane Doe testified that John Doe 1 began having "behavior issues" and "started acting out" some time in 2005.  [Dkt. #220, Attach 5, Jane Doe Dep., p.30-31].  John Doe 1 did not want to stay over at the Waraksas. *Id.*  As a consequence, Jane Doe arranged for John Doe 1 to stay with her mother. *Id.*  After June 2005, there were a few occasions when John Doe 1 would stay over at the Waraksa residence as Jane Doe did not have alternative childcare for him.  [Dkt. #241, Town's Local Rule 56(a)(1) Statement, ¶29].  John Does 2 and 3 continued to stay overnight at the Waraksa residence in July and August 2005. *Id.* at ¶28.   John Does 1, 2 and 3 stopped staying at the Waraksa residence entirely in late August of 2005.  *Id.* at ¶30.   No sexual assault or misconduct involving John Does 1, 2, or 3 occurred after September 19, 2005.  *Id.* at ¶48.

Waraksa did not physically or otherwise threaten John Doe 1 at anytime in order to induce his acquiescence in or his silence about the sexual abuse; nor did he mention the Emergency Management Agency or his acquaintance with members of the police or fire departments in order to induce his acquiesce in or

to keep silent about the sexual abuse.  Instead, John Doe 1 testified that Peter Waraksa "didn't threaten me.  He more like bribed me with stuff.  He kept buying me things.  He'd promise me a lot of things.  Like I wanted a train set, so he started bringing me all the model train stuff and collecting magazines.  He was basically bribing me to keep my mouth shut."  [Dkt. #241, Ex. K, John Doe 1 Dep., p. 41].  John Doe 1 never told anyone about the sexual assaults until late November 2005.  [Dkt. #241, Town's Local Rule 56(a)(1) Statement, ¶43].  He testified that "[p]art of the reason I didn't come out sooner is because I didn't think anyone would believe me, because he seemed like everyone liked him.  The police – he always said, oh, that's my friend from the police department … or the firefighter friends.  I never thought anyone would believe me."  [Dkt. #241, Ex. K, John Doe 1 Dep., p. 46].

John Doe 1 attested in an affidavit dated January 10, 2012, that "[a]ll incidents of sexual misconduct by Peter Waraksa against me occurred in connection with my participation in the Youth Cadet program in that they would occur when I would sleep over the night before early morning Emergency Management events."  [Dkt. #219, John Doe 1 aff., ¶6].  He further attested that "[a]t the time of the misconduct, I was aware that Peter Waraksa was the Assistant Director of the Town of East Windsor Emergency Management Agency and in charge of the Youth Cadet program… and that I was aware that Peter Waraksa had a close relationship with Mary Buckley, I knew that Mary Buckley was in charge of the Town of East Windsor Emergency Management Agency and also that she was a Connecticut State trooper."  *Id.* at ¶¶7-8.  Lastly, John Doe

declared that "[a]t the time of the misconduct, one reason I did not resist assault upon me, even when I knew it was wrong and made me feel uncomfortable, was because of the influence and authority Peter Waraksa has over me as a director of the Youth Cadet program." *Id.* at ¶9.

On December 8, 2005, Waraksa was arrested in incident to the police investigation of the sexual assault of John Doe 1. [Dkt. #197, Ex. 2, Arrest Warrant Application and Ex. 31 Officer Carl Narrative]. Detective Matthew Carl attested in the arrest warrant affidavit that Jane Doe had informed him that as a result of the Emergency Management Agency, she would commonly allow John Doe 1 to spend the night at Peter Waraksa's home prior to a parade and that she "used both Peter and Sherry Waraksa as overnight baby sitters on weekends." *Id.* In addition, John Doe 1 informed Detective Carl that because of Emergency Management parades and his mother's employment issues he would stay overnight at Peter Waraksa's home. *Id.* John Doe 1 also told Detective Carl that Peter Waraksa engaged in inappropriate sexual conduct with him on numerous occasions over the summer of 2005, including behavior while in the Waraksas's swimming pool. *Id.* John Doe 1 further indicated that he was forced by Peter Waraksa to shower with his younger brother and touch his younger brother in the private areas while Waraksa watched. *Id.* Detective Carl attested that John Doe 2 informed him that he knew Waraksa as his baby sitter and that Waraksa would engage in sexual misconduct with him and John Doe 1 while showering. *Id.*

Peter Waraksa gave the Police a sworn statement admitting that he engaged in sexual misconduct when he made John Doe 1 and 2 shower together

in his presence and when they swam in his pool.  [Dkt. #197, Ex. 30, Waraksa Statement].  Waraksa also declared that he had made John Doe 1 wash John Does 2 and 3 in the shower in his presence both at his home in East Windsor and at the Doe home in Enfield.  *Id.*  At the time of the assaults, John Doe 1 was twelve, John Doe 2 was six and John Doe 3 was three years old.  [Dkt. 197, Exs. 1 and 2].

The Court notes that the parties have offered facts regarding events that occurred after the sexual misconduct by Waraksa ended in September 2005 as well as facts regarding Mary Buckley's knowledge of Waraksa's sexual misconduct.  Because the Court concludes that Waraksa did not act under color of state law, the Court need not address these facts as they relate to the Plaintiff's state law claims and their predicate federal *Monell* and supervisory liability claims, which cannot survive if Waraksa was not acting under color of state law.

## Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Fed.R.Civ.P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir.2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.,* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S.

574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir.2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D.Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

<u>Analysis</u>

i.    **Section 1983 Claims**

Defendants argue that Plaintiffs' Section 1983 claims fail because Waraksa did not act under color of state law when he engaged in sexual misconduct with John Does 1, 2 and 3, but was merely acting within the ambit of his personal pursuits.  Section 1983 provides that "[e]very person who, under color of any [state] statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.  "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action." *Flagg v. Yonkers Sav. & Loan Ass'n,* 396 F.3d 178, 186 (2d Cir.2005) (internal quotation marks omitted).  "'A plaintiff pressing a claim of violation of his constitutional rights under § 1983 is thus required to show state action.'" *Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012) (quoting *Tancredi v. Metro. Life Ins. Co.,* 316 F.3d 308, 312 (2d Cir.2003)).

"State officials acting in their official capacities, even if in abuse of their lawful authority, generally are held to act 'under color' of law … This is because such officials are 'clothed with the authority' of state law, which gives them power to perpetrate the very wrongs that Congress intended § 1983 to prevent." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 949 n. 5 (1982).  Therefore, central to the analysis is the context of the challenged action.

"To act under color of state law or authority for purposes of section 1983, the defendant must have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  *Monsky v. Moraghan*, 127 F.3d 243, 245 (2d Cir. 1997) (internal quotation marks and citations omitted).   "Moreover, '[i]t is firmly established that a defendant in a §1983 suit acts under color of state law when he *abuses* the position given to him by the State.'"  *Id.* (quoting *West v. Atkins*, 487 U.S. 42, 49-50 (1988)) (emphasis in the original).   "It is 'axiomatic that under 'color' of law means 'pretense' of law and that acts of officers in the ambit of their personal pursuits are plainly excluded.'"  *Id.* (quoting *Pitchell v. Callan,* 13 F.3d 545, 547-48 (2d Cir.1994)).   "However, while it is clear that 'personal pursuits' of police officers [or other state officials] do not give rise to section 1983 liability, there is no bright line test for distinguishing 'personal pursuits' from activities taken under color of law.  More is required than a simple determination as to whether an officer was on or off duty when the challenged incident occurred.   For example, liability may be found where a police officer nonetheless invokes the real or apparent power of the police department."  *Pitchell*, 13 F.3d at 548 (citations omitted).

In  *U.S. v. Giordano*, 442 F.3d 30 (2d Cir. 2006), the Second Circuit thoroughly analyzed when a municipal official acts under the color of state law in the context of sexual misconduct with a minor.[2]  The Second Circuit emphasized

---

[2] In *Giordano*, the Second Circuit applied the color of law requirement in 18 U.S.C. §242 but noted that the requirement under §242 was "identical to the requirement under 42 U.S.C. §1983 that an official act under color of law."  442 F.3d at 43 n.16.

that "it is well-established that an official may act under color of law even when he or she encounters the victim outside the conduct of official business and acts for reasons unconnected to his or her office, so long as he or she employs the authority of the state in the commission of the crime." *U.S. v. Giordano*, 442 F.3d 30, 43 (2d Cir. 2006). The Second Circuit explained that "we have found that officials acted under color of law even when . . . they came into contact with their victims in the course of their private affairs." *Id.* (citing *Jocks v. Tavernier,* 316 F.3d 128, 134 (2d Cir.2003) (holding that off-duty police officer acted under color of law when he identified himself as a police officer and drew his gun on a motorist with whom he had an argument over the use of a roadside payphone); *Rivera v. La Porte,* 896 F.2d 691, 695-96 (2d Cir.1990) (holding that off-duty corrections officer acted under color of law when he arrested and assaulted driver following private argument during traffic jam)).   In addition, the Second Circuit noted that they have "found that officials acted under color of law when their misuse of official power made the commission of a constitutional wrong possible, even though the official committed abusive acts for personal reasons far removed from the scope of official duties." *Id. at 44* (citing *Monsky,* 127 F.3d at 244 (holding that judge acted under color of law in connection with a dog attack that occurred in his office because the dog was only permitted in the office as a result of the judge's position and authority); *United States v. Tarpley*, 945 F.2d 806, 808 (5th Cir. 1991) (holding that police officer acted under color of law when he assaulted his wife's lover and threatened to kill his victim if he reported the incident telling him "I'll kill, you I am a cop")).

The Second Circuit further noted in *Giordano* that it had previously held that "a state official acted under color of state law even when acting outside the ambit of official duty because the official used his or her power to make the crime possible by causing the victim to submit." *Id.* at 44-45 (citing *U.S. v. Walsh*, 194 F.3d 37, 41-43 (2d Cir. 1999) (holding that a prison guard who sadistically assaulted an inmate acted under color of law because the guard was cloaked with authority to order the prisoner to submit to repeated assaults. In coming to this conclusion, the Second Circuit emphasized that the prison guard was "on duty and in full uniform" and "acting within his authority to supervise and care for inmates under his watch when the assaults occurred."); *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1304-06 (11th Cir. 2001) (holing that rape of a city employee by the city manager after hours in the employee's home was perpetrated under color of law because the manager invoked his authority to create the opportunity to be alone with victim and continued to invoke his authority by harassing and humiliating victim at work)).

In *Giordano*, the Second Circuit concluded that the mayor of Waterbury acted under color of law when he sexually assaulted the daughter and niece of a prostitute. In coming to this conclusion, the Second Circuit found that the mayor "actively and deliberately used his apparent authority as mayor to ensure that the victims did not resist or report the ongoing abuse." 442 F.3d at 47. The Second Circuit emphasized that the mayor "threatened his victims by invoking a 'special authority' to undertake retaliatory action" and "used his authority to cause the victims to submit to repeated abuse" by making his victims "understand that he

could jail or otherwise harm them and their families if they reported it."  *Id.* at 45.
After the mayor was done abusing the minors, he told them that they would get in
trouble and that their mother/aunt would go to jail if they told anyone.  *Id.* In
addition, the mayor made clear to the minors that he had control of the police.  *Id.*
at 46.  On these facts, the Second Circuit concluded there was sufficient evidence
that Giordano invoked the "real or apparent authority" of his office to make the
continuing sexual abuse possible. *Id.*  and emphasized the focal point of the color
of law analysis.  The Second Circuit explained that the color of law requirement in
*Giordano* was satisfied because there was evidence of active and deliberate
abuse or misuse of apparent state authority to perpetrate the sexual misconduct.
*Id.* at 47.

In coming to this conclusion, the Second Circuit distinguished the facts of
*Giordano* from its previous decision in *Pitchell* and emphasized the focal point of
the color of law analysis.  In *Pitchell*, the Second Circuit held that an officer's
drunken shooting of a voluntary guest in a private home was not "invok[ing] the
authority of the police department" or acting within the line of duty. 13 F.3d at
547-48.  In coming to this conclusion, the *Pitchell* court rejected the plaintiff's
"novel contention that the 'police presence' ha[d] a numbing effect on [the
plaintiff's] defenses and that, while under different circumstances the moment a
gun appeared [the plaintiff] would have been on guard."  *Id.* at 548-49.   The
Second Circuit explained that "[t]his argument erroneously centers on [the
plaintiff's] subjective reaction to [the officer's] conduct rather than the nature of
[the officer's] activity, and misses the essence of the color of law requirement

and the protection afforded by section 1983.  Unlike in a negligence action, the focus of inquiry in the instant case is not on the standard of care used by the officers but rather on whether there was an abuse or misuse of a power conferred upon them by state authority.  If [the officer] was not acting with actual or pretended authority, he was not acting under color of law, and his actions were not state actions."  *Id.* at 548-49.  The Second Circuit distinguished *Pitchell from Giordano* on the basis that there was no evidence of any "actual abuse or misuse of state power" in *Pitchell.*  *Giordano*, 442 F.3d at 47.  The Second Circuit explained that the plaintiff's subjective reaction in *Pitchell* was irrelevant in light of the lack of any "'abuse or misuse of state power.'"  *Id.* (citation omitted).  In contrast, the Second Circuit emphasized in *Giordano* that there was evidence of the active and deliberate use of apparent state authority "to ensure that the victims did not resist or report the ongoing abuse" and therefore there was sufficient evidence that the sexual misconduct was "made possible only because the wrongdoer was clothed with the authority of state law."  *Id.*

Other circuits have likewise held that the color of law requirement is only satisfied where there is some active and deliberate abuse or misuse of state power by a defendant.  *See, e.g., Haberthur v. City of Raymore, Mo.,* 119 F.3d 720 (8th Cir.1997) (plaintiff sufficiently alleged officer was acting under color of law where officer once followed her home in his police cruiser and threatened to give her a speeding ticket, and later, while he was on duty and in uniform, sexually assaulted her at her place of work); *Romano v. Young*, 378 F. App'x 172, 174-75 (3d Cir. 2010) (holding that genuine issue of material fact existed as to whether

police officer acting under color of law when the officer had a several months long sexual relationship with a fourteen year old girl where there was evidence that the police officer threatened to put the girl's brother in jail if she did not have sexual relations with him); *Pickrel v. City of Springfield,* 45 F.3d 1115, 1118-117 (7th Cir. 1995) (holding that officer acted under color of state law where he served as a private security guard at a McDonald's restaurant and arrested plaintiffs while wearing his police uniform, badge, and gun which were signs of his state authority).

In accord with the Second Circuit jurisprudence, the Sixth Circuit has similarly held that "a defendant's private conduct, outside the course or scope of his duties and unaided by any indicia of ostensible state authority, is not conduct occurring under color of state law." *Burris v. Thorpe*, 166 F. App'x 799, 802 (6th Cir. 2006). In *Burris*, the Sixth Circuit held that a police officer did not act under color of state law when he engaged in consensual sexual intercourse while on duty and knowing he was HIV positive with a citizen ride-along participant. The Sixth Circuit emphasized that the "consensual sexual relationship" was not "aided 'by any indicia of actual or ostensible state authority'" and that "[w]hile Ms. Burris may have been attracted to Thorpe in part because he was a police officer, she willingly entered into a long-term consensual sexual relationship with him. Plaintiff concedes that [Thorpe] never used his position as a police officer to coerce her to have sex with him, or to prevent her from breaking off the relationship." *Id.* at 802.

Both the Sixth and Eighth Circuits have further held that more than simple awareness by a plaintiff that a defendant is a state official is necessary to establish that a defendant's actions were aided by any indicia of ostensible state authority. In *Mooneyhan v. Hawkins*, No. 96–6135, 1997 WL 685423, at *5 (6th Cir. Oct.29, 1997) (unpublished decision), the Sixth Circuit held that a police officer did not act under color of state law when he raped the plaintiff because he took advantage of his 10 month friendship with the plaintiff to effectuate the rape and did not exercise or purport to exercise his authority as a police officer in order to commit the rape. *Id.* The Sixth Circuit explained that although the plaintiff did know that the defendant was a police officer and that defendant's father was a lieutenant on the police force and that "perhaps this knowledge may have facilitated the [defendant's] conduct," the "test for whether an officer acted under color of state law is not what the victim knew about the officer at the time of the incident, but rather what actions did the officer take to assert his authority under color of state law." *Id.* (citing *West*, 487 U.S. at 49).

The Eight Circuit similarly held that knowledge of a defendant's status alone by a plaintiff "is not sufficient to convert the actions [the defendant] took in the pursuit of his private interest into action taken under color of state law." *Roe v. Humke*, 128 F.3d 1213, 1217 (8th Cir. 1997). In *Roe*, a police officer who was a goodwill ambassador to a local school met the minor plaintiff outside the school in his police car and uniform and would occasional give the plaintiff rides home, buy her soda and candy, and gave her a pen set for Christmas. The defendant police officer then arranged with the consent of the minor plaintiff's mother to

bring her and her friend to his farm to ride all-terrain vehicles where he engaged in sexual misconduct.  *Id.* at 1214-15.   The Eighth Circuit concluded that because the officer was off-duty, driving his personal vehicle, was not wearing his uniform or badge and was not carrying his gun when he sexually assaulted the minor plaintiff he was acting in his own personal pursuit and "not for any purpose legitimately or purportedly related to the exercise of his responsibilities as a police officer."  *Id.* at 1216.  The Eighth Circuit rejected the argument that the police officer acted under color of law because he was able to obtain the trust of the minor plaintiff and her parents because of his status as a police officer and held that "because there was no nexus between his position as a police officer and his abuse of [the plaintiff] on that day in question" the officer did not act under color of law.  *Id.* at 1217-18.  The Sixth Circuit's rationale in *Burris* and *Mooneyhan* and the Eighth Circuit's rationale in *Roe* dovetail with the Second Circuit's analysis in *Giordano* and *Pitchell* and taken together instructs that a plaintiff's subjective reaction based on an awareness that a defendant is a state official is irrelevant to the color of law analysis where there is no evidence that a defendant actively and deliberately abused or misused state power.

These cases make further clear that the color of law requirement cannot be satisfied in the absence of any affirmative act by a defendant to assert his authority under state law.  *See, e.g.*, *Almand v. DeKalb County*, 103 F.3d 1510, 1514-15 (11th Cir. 1997) (finding that police officer was not acting under color of state law when he forced his way into a woman's apartment and raped her because when the officer "reentered the apartment by forcibly breaking in, he

was no different from any other ruffian" and the "act of breaking into the apartment and, by force, raping [Plaintiff] was a private act not accomplished because of the power possessed by virtue of state law"); *Waters v. City of Morristown, TN*, 242 F.3d 353, 360 (6th Cir. 2001) (holding that veterinarian who also held position as a city alderman did not act under color of law when he harassed his veterinary assistant as the plaintiff was "unable to provide any credible evidence to substantiate her claims that *but for* [the defendant's] status as an alderman, he would not have been able to pursue these misdeeds"  and concluding that the defendant would have been able to pursue his harassment "because of their close personal relationship and because of his status as her employer, even if he had not been a city of Morristown alderman.") (emphasis in the original); *Harmon v. Grizzel*, No.1:03CV169, 2005 WL 1106975, at *1-2 (S.D. Ohio April 21, 2005) (finding that police officer who sexually assaulted plaintiff was not operating under color of state law where the police officer used his prior personal relationship with plaintiff and not any police authority to commit rape and therefore the officer could "have behaved as he did without the authority of his office"); *Delcambre v. Delcambre,* 635 F.2d 407, 408 (5th Cir. 1981) (holding that alleged assault by on-duty police chief at police station did not occur under color of state law because altercation with plaintiff, defendant's sister-in-law, arose out of a personal dispute and defendant neither arrested nor threatened to arrest the plaintiff).

Defendants argue that Waraksa did not invoke "any actual or pretended authority of the Emergency Management Agency at the time of the sexual

assaults alleged" and that the undisputed facts demonstrate that the assaults occurred when the minor plaintiffs were left in Waraksa's care for babysitting purposes as a matter of convenience for Jane Doe and therefore Waraksa was acting as a private citizen.  [Dkt. #241, Def. Mem., p. 9-10].  In response, the Plaintiffs argue that "Waraksa gained the mantle of authority he needed to sexually assault the plaintiffs by virtue of the position he held in the Emergency Management Agency."   [Dkt. #250, Pl. Mem. p.32]. Plaintiffs also argue that "Waraksa was able to use his position in Emergency Management, and as head of the Cadet program as a pretense to gain authority and influence over John Doe 1" and that it is "crucial to recognize the difference in the way the Plaintiffs were treated by Waraksa prior to his appointment as the supervisor of the Youth Cadet program from the way they were treated subsequent to the appointment."  [Dkt. #251, Pl. Mem., p.29-30].  Plaintiffs contend that there was never an instance of criminal and/or sexual misconduct prior to his Waraksa's appointment as supervisor of the cadet program despite the fact that he had unfettered access to the Plaintiffs in his home and that it was only after his appointment that he engaged in such misconduct.  Plaintiffs also stress that Joe Doe 1 did not resist Waraksa because of his influence and authority over him as his supervisor.  *Id.* at 30.

Plaintiffs' arguments attempt to side step around the critical inquiry into whether Waraksa actively and deliberately abused or misused the power conferred upon him by virtue of his position as a volunteer member of the Emergency Management Agency and in particular as supervisor of the cadet

program.  Plaintiffs essentially ask the Court to infer that Waraksa must have abused his state authority based on the fact that the sexual abuse only started after he obtained his position as a volunteer of the Emergency Management Agency and in particular as the supervisor of the cadet program.  The fact that Waraksa sexually abused John Does 1, 2 and 3 only after he obtained this position cannot convert an act that was purely within the ambit of his personal pursuits into state action.  To make such an inference risks converting every act by a defendant in the ambit of his or her personal pursuits into state action by virtue of the status of the defendant as a state official contrary to well established precedent excluding acts of officers in their personal pursuits as acts taken under color of law. *Monsky*, 127 F.3d at 245.

Moreover this inference is not supported by any facts in the record.  First, Waraksa did not gain access to the Plaintiffs by virtue of being a municipal official.  He had a relationship with them before he became a member of the Emergency Management Agency.  Second, the undisputed facts demonstrate that Waraksa did not actively and deliberately abuse or misuse any power conferred upon him by state authority when he sexually abused John Does 1, 2 or 3.  John Doe 1 unequivocally testified that Peter Waraksa did not threaten him.  [Dkt. #241, Ex. K, John Doe 1 Dep., p. 41].  John Doe 1 explained that instead of threatening him or inducing him based on his official power or authority, Waraksa bribed him by buying him things like model train magazines and accessories.  *Id.*  According to John Doe 1, Waraksa was "basically bribing me to keep my mouth shut."  *Id.* Moreover, there was no nexus between these "bribes" and Waraksa's position in

the Emergency Management Agency.  For example, Waraksa did not promise to allow John Doe 1 to hold a flag in the parade or give him a special position or rank in the cadet program in exchange for his acquiescence or silence.  This lack of a nexus further bolsters the conclusion that Waraksa's private conduct was unaided by any indicia of ostensible state authority.

Joe Doe 1 also explained that he did not report the sexual abuse because he didn't think anyone would believe him in light of the fact that he was aware that Waraksa was friends with police officers and fire fighters.  *Id.* at 46. However, there is no evidence that Waraksa actually threatened John Doe 1 into silence by making it known to him that he had these friends in order to make the continuing sexual abuse possible.  Unlike in *Giordano*, there is no evidence that Waraksa explicitly threatened John Doe 1 by invoking any special authority to undertake retaliatory action.  Waraksa never told John Doe 1 that he could get in trouble or threatened him or his family with arrest or other retaliation related to his authority as a member of the Emergency Management Agency as was the case in *Giordano*.  Further unlike the mayor in *Giordano*, Waraksa's position as a volunteer member of the Agency gave him no apparent authority to control the police or fire department.  In *Giordano*, the Second Circuit noted that the mayor's victims legitimately believed his threats of arrest by virtue of the aura of power Giordano invoked as mayor.  442 F.3d at 46 n.22.  Consequently, no trier of fact could conclude that Waraksa actively and deliberately threatened John Doe 1 into silence by invoking his apparent authority as a member of the Emergency Management Agency.

In viewing the evidence in the light most favorable to the Plaintiffs, at best the evidence demonstrates that John Doe 1 did not resist or report the sexual abuse because of his awareness of Waraksa's position in the Emergency Management Agency and not as the result of any affirmative act Waraksa took to assert such authority.  John Doe 1's affidavit clearly demonstrates that his failure to resist and report the abuse was based on his awareness of Waraksa's position and his sense that Waraksa had authority over him by virtue of that position.  *See* [Dkt. #219, John Doe 1 aff., ¶¶6-9].  As discussed above, a plaintiff's knowledge of a defendant's status as a state official "is not sufficient to convert the actions [the defendant] took in the pursuit of his private interest into action taken under color of state law."  *Roe*, 128 F.3d at 1213.  The color of law inquiry focuses on the actions the official took and not on what the victim knew about the official at the time of the incident.  In the absence of any actual abuse or misuse of state power by a defendant, a plaintiff's subjective reaction to a state official's conduct is irrelevant to the color of law analysis.  *Pitchell*, 13 F.3d 3d at 548-49.  Because there is no evidence that Waraksa deliberately and actively invoked his authority as a member of the Emergency Management Agency and as supervisor of the cadet program, it would be an error to focus on John Doe 1's subjective reaction to Waraksa's conduct as that would "miss[] the essence of the color of law inquiry."  *Id.* at 548-49.

No reasonable trier of fact could conclude that Waraksa affirmatively acted to assert his authority as a member of the Emergency Management Agency to make the continuing sexual abuse possible.  Instead, the evidence demonstrates

that Waraksa had access to and authority over John Does 1, 2 and 3 not because of his position in the Emergency Management Agency but by virtue of his personal friendship with the Doe family and his status as a babysitter, which predated both Peter Waraksa's and John Doe 1's involvement with the Agency.  It is undisputed that Jane Doe had been good friends with the Waraksas for almost two years prior to Peter Waraksa becoming involved in the Emergency Management Agency.  It is further undisputed that Jane Doe began having the Waraksas act as babysitters for her three children even before John Doe 1 was formally a member of the Agency.  The close personal nature of their friendship is evidenced by the fact that Jane Doe listed Peter Waraksa as John Doe 1's emergency contact at school.  Jane Doe admits that John Doe 1 would sleep over the night before Agency events because it was convenient. [Dkt. #220, Attach 5, Jane Doe Dep., p.70].   Moreover, Jane Doe admits that her children would frequently stay over at the Waraksa residence for reasons entirely unrelated to the Emergency Management Agency, including her regular Friday night work commitment in 2005 and to play with other children staying at the Waraksa residence.  [Dkt. #220, Attach 5, Jane Doe Dep., p.30].  In addition, Jane Doe permitted John Doe 1 to sleep over when the Waraksas would take John Doe 1 on trips to museums and amusement parks.  *Id.* at 31.  On these facts, it is clear that Peter Waraksa would have been able to pursue his sexual abuse of John Does 1, 2 and 3 because of his close personal relationship and because of his status as their babysitter even if he had not been a member of the Emergency Management Agency.  As was the case in *Waters* and *Harmon*, Waraksa clearly could have

behaved as he did without the authority of his office by virtue of his personal relationship with the Doe Family and his status as their babysitter.  Indeed, the fact that Waraksa also sexually abused John Does 2 and 3 along with John Doe 1 despite the fact that they were never involved with the Emergency Management Agency and were too young to understand his status as a member of the Agency further bolsters this conclusion.

The facts of the instant case are more similar to the facts involved in *Roe v. Humke*.  In *Roe*, the Eighth Circuit concluded that the officer was not acting under color of state law where the sexual abuse occurred while he was off-duty, not wearing his uniform or invoking other signs of his state authority.  Similarly in the instant case, there is no evidence that Waraksa was wearing a uniform or other emblem of his position in the Emergency Management Agency when he sexually assaulted John Doe 1 nor was he affirmatively purporting to exercise his responsibilities as a member of the Agency.

The Plaintiffs also argue that Waraksa acted under color of law because all the incidents of sexual misconduct by Waraksa occurred when John Doe 1 would sleep over the night before an Agency event. [Dkt. #219, John Doe 1 aff., ¶6]. However as noted above the evidence demonstrates that Jane Doe permitted John Doe 1 to stay over the night before an event not because of Waraksa's position in the Agency but because of her close personal relationship with the Waraksas and her work schedule which led her to routinely used the Waraksas as babysitters for her own personal reasons.  In addition, there is evidence in the record that the sexual abuse was not just limited to the night before an Agency

event.   Peter Waraksa declared in a sworn statement to the police that he also engaged in sexual misconduct with John Does 1, 2 and 3 in the shower while at Jane Doe's home in Enfield. [Dkt. #197, Ex. 30, Waraksa Statement].   In addition, John Does 1 and 2 stated to the police that Waraksa engaged in sexual misconduct while in the Waraksa swimming pool. *See* [Dkt. #197, Ex. 2, Arrest Warrant Application and Ex. 31 Officer Carl Narrative].   In view of the close personal relationship between Peter Waraksa and the Doe family, which predated even Waraksa's involvement in the Agency and the lack of evidence that Waraksa deliberately and actively abused or misused state power to make the sexual abuse possible, no trier of fact could conclude that the sexual misconduct was made possible because Waraksa was clothed with the authority of state law.   The Plaintiffs have failed to submit sufficient evidence to raise a genuine dispute of material fact as to whether Waraksa acted under color of law.   Accordingly, the Court concludes that Waraksa did not act under color of law.

Because the challenged action, albeit tragic and reprehensible, does not constitute state action, Plaintiffs' Section 1983 claims necessarily fail.   "Second Circuit case law holds that where an off-duty officer did not act under color of law, the injury inflicted on the victim is one of private violence." *Claudio v. Sawyer*, 675 F.Supp.2d 403, 410 (S.D.N.Y. 2009) (citing *Pitchell*, 13 F.3d at 549).   "Without a state actor, there can be no "'independent constitutional violation'.   If there is no independent constitutional violation," a *Monell* claim against the City will necessarily fail." *Id.* (quoting *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006)).   Because Waraksa did not act under color of law, there is no

independent constitutional violation as the sexual abuse was an act of private violation and therefore the Town is not liable under *Monell* for the private acts of its employees.  The same logic applies to Plaintiffs' Section 1983 supervisory liability claim against Buckley.  "Supervisory liability under § 1983 presupposes a constitutional violation." *Anderson v. Lantz*, No. 3:07-cv-1689 (MRK),  2009 WL 2132710, at *7 (D. Conn. July 14, 2009) (citing *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) ("To establish the liability of a supervisory official under § 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional violations.")).  Thus courts have held that where a plaintiff "has not established any underlying constitutional violation, [plaintiff] cannot state a claim for § 1983 supervisory liability." *Elek v. Inc. Vill. of Monroe,* 815 F.Supp.2d 801, 808 (S.D.N.Y. 2011); *Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1999) ("Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation."); se*e also Alston v. Bendheim*, 672 F.Supp.2d 378, 388–89 (S.D.N.Y.2009) ("The failure to state a claim for an underlying violation forecloses supervisory liability."); *Clark v. Sweeney*, 312 F.Supp.2d 277, 298 (D.Conn. 2004) ("As there was no underlying deprivation of constitutional rights, accordingly, there can be no supervisory liability ....").  Consequently, the Court grants summary judgment on Plaintiffs' Section 1983 claims against the Town and Buckley.

The Town also argues in its motion for summary judgment that Plaintiffs cannot sustain their Section 1983 claim based on a theory that the State had an affirmative obligation under the Constitution to protect John Does 1, 2 and 3 from

the sexual assaults by Waraksa under the Supreme Court precedent of *Deshaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 195 (1989) and its progeny.  In response, the Plaintiffs clarify that they "do not allege that the Town has an affirmative duty to protect them from the acts of third parties." [Dkt. #250, Pl. Mem., p,52-53].  The Court therefore need not address the Town's arguments as Plaintiffs concede that they are not basing their Section 1983 claim on a failure to protect theory.

### ii.    State Law Claims

Having granted summary judgment as to the federal law claims against the Defendants, the Court declines to exercise its supplemental jurisdiction over the Plaintiffs' state law claims, which can be ably addressed in the Superior Court. "Supplemental or pendent jurisdiction is a matter of discretion, not of right. Thus, the court need not exercise supplemental jurisdiction in every case." *Nicholson v. Lenczewski*, 356 F.Supp.2d 157, 165-66 (D. Conn. 2005) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 715-26 (1966)).  "The federal court should exercise supplemental jurisdiction and hear a state claim when doing so would promote judicial economy, convenience and fairness to the litigants.  The court should decline to exercise supplemental jurisdiction, however, when state law issues would predominate the litigation or the federal court would be required to interpret state law in the absence of state precedent. In addition, the court may decline to exercise supplemental jurisdiction where the court has dismissed all claims over which it has original jurisdiction." *Id.* (citing 28 U.S.C. § 1367(c)(3)); *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("in the usual case in

which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims"); *One Communications Corp. v. J.P. Morgan SBIC LLC*, 381 F. App'x 75, 82 (2d Cir. 2010) ("If all of a plaintiff's federal claims are dismissed, a district court is well within its discretion to decline to assert supplemental jurisdiction over any state law claims").  In the instant case, the numerous state law claims will predominate because the Court has granted summary judgment on all of the Plaintiffs' federal law claims over which the Court had original jurisdiction.  In addition, the remaining state law claims involve a complicated inquiry into governmental immunity under state law. Consequently, the Court finds that fairness and comity point toward declining to exercise jurisdiction.  The Court therefore declines supplemental jurisdiction over the remaining state law claims, which are dismissed without prejudice to re-filing in state court.  The Plaintiffs' state law claims may therefore still be brought in state court which is a manifestly proper and able forum where the Plaintiffs may find a remedy for their alleged injuries.

### Conclusion

For the foregoing reasons, the Court GRANTS Defendants' motions for summary judgment as to Plaintiffs' federal law claims and dismisses Plaintiffs' state law claims without prejudice to re-filing in state court. [Dkt. ## 241 and 242]. The Clerk is directed to enter judgment in favor of Defendants on Plaintiffs' federal law claims and close the case.

**IT IS SO ORDERED.**

_____/s/_____

**Hon. Vanessa L. Bryant**

**United States District Judge**

**Dated at Hartford, Connecticut: February 13, 2013**